**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

TYLER FIRE EQUIPMENT, LLC, AND TYLER FIRE
EQUIPMENT SERVICE CORP.,

                                        Plaintiffs,

                 -vs-

OSHKOSK CORP., PIERCE MANUFACTURING,
INC., HIGH PEAKS FIRE APPARATUS, LLC, AN-
THONY M. MASTROBATTISTA *individually and as*
*President of High Peaks Fire Apparatus, LLC*, DA-
VID MCALICE, *individually and as Regional Vice*
*President of Pierce Manufacturing, Inc.*, and DANIEL        DECISION AND ORDER
A. OLSZANSKI, *individually and as Vice President of*
*High Peaks Fire Apparatus, LLC*,                             14-CV-6513-CJS

                                        Defendants;

---

DAVID McALICE, *individually and as Regional Vice*
*President of Pierce Manufacturing, Inc.*, and PIERCE
MANUFACTURING, INC.,

                                   Counter-Claimants,

                 -vs-

TYLER FIRE EQUIPMENT, LLC, AND TYLER FIRE
EQUIPMENT SERVICE CORP.,

                                   Counter-Defendants.

---

## APPEARANCES

For Plaintiffs/Counter-Defendants:

Robert Zarco, Esq.
Gabriel Estadella, Esq.
Himanshu M. Patel, Esq.
Zarco Einhorn Salkowski & Brito, P.A.
100 S.E. 2nd Street 27th Floor
Miami, FL 33131
(305) 374-5418

For Defendants/Counter-Claimants Pierce Manufacturing, Inc.; David McAlice, *individually and as Regional Vice President of Pierce Manufacturing, Inc.*:

Donald W. O'Brien, Jr., Esq.
Woods Oviatt Gilman LLP
700 Crossroads Building
Two State Street
Rochester, NY 14614
(585) 987-2810

Carl J. Chiappa, Esq.
John J. Sullivan, Esq.
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
(212) 918-3000

For Defendant High Peaks Fire Apparatus, LLC; Anthony M. Mastrobattista *individually and as President of High Peaks Fire Apparatus, LLC*:

Jeffrey A. Siegel, Esq.
O'Connell & Aronowitz, P.C.
54 State Street
Albany, NY 12207-1885
(518) 462-5601

Paul A. Feigenbaum, Esq.
Mazzotta Siegel & Vagianelis, P.C.
9 Washington Square
Albany, NY 12205
(518) 452-0941

## INTRODUCTION

**Siragusa, J.** This breach of contract case is before the Court on two motions:

(1) A motion seeking partial dismissal filed on January 23, 2015, ECF No. 35, by Pierce

Manufacturing, Inc. ("Pierce") and David McAlice ("McAlice") (collectively the "Pierce de-

fendants"); and (2) A motion to dismiss the first amended complaint filed on January 22,

2015, ECF No. 33, by High Peaks Fire Apparatus, LLC ("High Peaks"), Anthony M. Mastrobattista ("Mastrobattista"), and Daniel A. Olszanski ("Olszanski") (collectively the "High Peaks defendants").

A motion seeking partial dismissal of the original September 5, 2014, complaint, filed on November 17, 2014, ECF No. 18, by the Pierce defendants, is dismissed as moot. For the reasons stated below, the two pending motions are granted, Counts III and IV are dismissed with prejudice, Counts VII and VIII are dismissed without prejudice and Plaintiffs may move to amend Counts VII and VIII.

## BACKGROUND

Tyler Fire Equipment, LLC and Tyler Fire Equipment Service Corp. ("Tyler"), commenced this action by filing a complaint on September 5, 2014, ECF No. 1, alleging a violation of the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–26 (2014); a breach of fiduciary duty; a breach of contract; a breach of implied covenant of good faith and fair dealing; fraudulent misrepresentation; negligent misrepresentation; tortious interference with existing contractual relations; and tortious interference with prospective business relations. Compl. ¶ 1. Subsequently, The Pierce defendants filed their motion to dismiss, November 17, 2014, ECF No. 18, along with an answer to the original complaint and a counterclaim, ECF No. 22. The Court issued a schedule for briefing, ECF No. 23. On December 8, 2014, 21 days after Pierce's and  McAlice's response was filed, Tyler filed what it titled as a First Amended Complaint ("first amended complaint"). 1st Am. Compl., Dec. 8, 2014, ECF No. 24; *see* Fed. R. Civ. P. 15(a)(1)(B) (a plaintiff may file an amended complaint 21 days after service of a responsive pleading or motion). The following day, Tyler voluntarily dismissed its claims against Oshkosh Corp. without prejudice. Notice of Voluntary Dismissal, Dec. 9, 2014, ECF No. 25. On January

5, 2015, Tyler answered the counterclaim. Answer to Counterclaim, Jan. 5, 2015, ECF

No. 29. High Peaks, The Pierce defendants then filed their motions.

The first amended complaint, containing 152 paragraphs, is now the operative

pleading in the case. The following information is taken selectively from that complaint

(footnotes and some parenthetical information have been omitted).

> 12. In or around June 1977, Wayne and Victoria Tyler (the "Tylers") founded a fire equipment sales and service business in Elmira, New York after having worked in the sales department at Pierce in Appleton, Wisconsin. Upon returning to Elmira, the Tylers operated the new business out of their home. The Tylers became a Pierce dealer upon their return to Elmira in 1977, and at that time began selling and servicing Pierce products in New York and Pennsylvania . . . .

> 15. On or about May 27, 2000, Tyler Fire Equipment entered into a Dealership Agreement with Pierce, which was effective May 1, 2000 (the "Dealership Agreement"). As reflected in Paragraph 6.1 of the Dealership Agreement, the Dealership Agreement had an initial term beginning May 1, 2000 and ending April 30, 2010 (the "Term"), but could be "renewed, extended or otherwise continued as the parties may agree in writing, or as may be provided otherwise by applicable law in the state in which [Tyler Fire Equipment] has its principal place of business," *i.e.*,   New York State . . . .

> 17. Pursuant to Paragraph 3.1 of the Dealership Agreement, Pierce appointed Tyler Fire Equipment as Pierce's exclusive independent marketing, sales and service representative for the solicitation of orders for Pierce-manufactured custom and commercial fire apparatuses for a territory comprised of 34 counties in New York State, including the Counties of Albany, Broome, Cayuga, Chenango, Clinton, Columbia, Cortland, Delaware, Dutchess, Essex, Franklin, Fulton, Green, Hamilton, Herkimer, Jefferson, Lewis, Madison, Montgomery, Oneida, Onondaga, Orange, Oswego, Otsego, Putnam, Rensselaer, Rockland, St. Lawrence, Saratoga, Schenectady, Schoharie, Sullivan, Tioga, Tompkins, Ulster, Warren, Washington, and Westchester, and 11 counties in Pennsylvania, including the Counties of Bradford, Cameron, Centre, Lycoming, Pike, Potter, Sullivan, Susquehanna, Tioga, and Wayne (the "Territory") . . . .

19. Pursuant to Paragraph 4.6 of the Dealership Agreement, Pierce is and was obligated to sell products to Tyler Fire Equipment and consult with Tyler Fire Equipment to assist Tyler Fire Equipment to achieve desired market share levels and to develop the potential of the Territory . . . .

24. In or around December 2009, Pierce took five counties in lower New York (Dutchess, Orange, Putnam, Rockland, and Westchester) away from the Tyler Fire Companies, based on, according to Pierce, the Tyler Fire Companies' poor sales performance. This was despite Pierce having received letters from many customers specifically requesting to purchase items from the Tyler Fire Companies. Upon information and belief, Pierce denied those customer requests. The above counties were subsequently transferred by Pierce to dealer Firematic Supply Co., located at 10 Ramsay Road, East Yaphank, New York 11967.

25. Pierce told the Tyler Fire Companies that they would lose more territories if they did not withdraw from the five counties. It was at or around this time that Pierce began accusing the Tyler Fire Companies of not selling a sufficient number of apparatuses.

26. As a result of Pierce's actions with respect to lower New York, the Tyler Fire Companies were forced to cancel contracts with their customers, causing significant damage to the Tyler Fire Companies' sales and service operations.

28. In or around the first half of 2011, Pierce agreed to assist the Tyler Fire Companies in exploring the possibility of finding a third-party buyer to purchase the Tyler Fire Companies.

29. On or about May 12, 2011, in furtherance of this effort, the Tyler Fire Companies entered into a Confidentiality Agreement with Pierce and McAlice (the "Pierce Confidentiality Agreement"). The Tyler Fire Companies agreed to furnish to Pierce and McAlice certain confidential information relating to the operation and affairs of the Tyler Fire Companies ("Confidential Information") for the purpose of aiding McAlice and Pierce in their review of the Tyler Fire Companies.

30. In furtherance thereof, Pierce sought to, among other things, identify an employee of the Tyler Fire Companies who might be interested in establishing a new company to succeed the Tyler Fire Companies as a Pierce dealer and servicer. Pierce represented to Mr. Tyler that it had a succession plan in place . . . .

34. In or around May 2011, the Tyler Fire Companies began discussing with non-party, Municipal Emergency Services, Inc. ("MES"), the possible acquisition of the Tyler Fire Companies by MES. However, Pierce blocked the deal without cause, resulting in significant harm to the Tyler Fire Com-

panies. Non-party Daniel Peters ("Peters"), then Vice President of Sales and Marketing for Pierce, met with Mr. Tyler at the Tyler Fire Companies' Elmira office to discuss the acquisition. When Mr. Tyler identified the interested party as MES, Peters stated to Mr. Tyler that Pierce would entertain no proposals from that entity for the purchase of the Tyler Fire Companies . . . .

37. In or around fall 2013, Mastrobattista and Olszanski began discussions with the Tyler Fire Companies regarding their possible acquisition of the Tyler Fire Companies.

38. On or about November 29, 2013, upon information and belief, Mastrobattista and Olszanski formed High Peaks, under New York law, in connection with their potential purchase of the Tyler Fire Companies through High Peaks.

39. On or about December 2, 2013, the Tyler Fire Companies entered into a Confidentiality Agreement with Olszanski and Mastrobattista (the "High Peaks Confidentiality Agreement") . . . .

46. Upon information and belief, beginning in or around August 2013, in direct contravention of the Pierce Confidentiality Agreement and, later, in direct contravention of the High Peaks Confidentiality Agreement, Mastrobattista, Olszanski and McAlice, individually and as a representative of Pierce, and in concert with one another, began discussing the potential sale of the Tyler Fire Companies with one another and with the Tyler Fire Companies' customers, vendors and employees, and with other individuals, in violation of the Pierce Confidentiality Agreement and the High Peaks Confidentiality Agreement . . . .

50. Upon information and belief, McAlice and Pierce, by and through McAlice, breached the Pierce Confidentiality Agreement to reduce the purchase price of the Tyler Fire Companies, through lost customers and otherwise, and to maximize their profits at the Tyler Fire Companies' expense, and Pierce and McAlice exercised that coercion in a bad faith attempt to use nonrenewal notices as a lever to pressure the Tyler Fire Companies into purchasing additional inventory and hiring additional employees, leading to the demise of the Tyler Fire Companies . . . .

53. Upon information and belief, Mastrobattista, Olszanski and High Peaks unlawfully disclosed protected information to harm the Tyler Fire Companies in order to reduce the potential purchase price of the Tyler Fire Companies, and, once they realized that they would not be able to obtain the necessary financing to purchase the Tyler Fire Companies, to harm the Tyler Fire Companies knowing that High Peaks would soon be a direct competitor of the Tyler Fire Companies.

54. As a result of the impermissible disclosure of information by Defendants, many customers of the Tyler Fire Companies became alarmed and ceased purchasing products and services from the Tyler Fire Companies or otherwise ceased doing business with the Tyler Fire Companies, including, but not limited to those individuals identified in paragraph 56. Many of the Tyler Fire Companies' employees have also left the Tyler Fire Companies, including, but not limited to those identified in paragraphs 68, 69 and 74. All of this has been to the extreme detriment of the Tyler Fire Companies . . . .

56. In fact, almost every customer of the Tyler Fire Companies has indicated its apprehension, and customers have in most cases either withdrawn their business from the Tyler Fire Companies entirely and/or have significantly reduced the goods and/or services that they purchase from the Tyler Fire Companies. Such customers include, but are not limited to, fire stations located in Ausable Forks, Lake Placid, Latham, Plattsburg (Stations 2 and 3), Round Lake, Salem and West Albany, New York, and in Clifford, Pennsylvania.

The first amended complaint details a number of email communications which Tyler claims violated the terms of the Confidentiality Agreements. The Court will not set out the details here, but will discuss them as relevant to the pending motions in the Analysis section of this decision and order. The following information also comes from the first amended complaint.

65. On or about January 21, 2014, the Tyler Fire Companies and High Peaks signed a Letter of Intent ("LOI") regarding the possible purchase of the Tyler Fire Companies by High Peaks . . . .

71. On or about January 31, 2014, a customer of the Tyler Fire Companies, AuSable Forks, informed the Tyler Fire Companies that McAlice, Olszanski and another individual, had indicated to AuSable that High Peaks was the new Pierce dealer for the Territory. At or around that same time, the Tyler Fire Companies were receiving numerous calls from customers and suppliers, including, but not limited to, certain of those individuals identified in paragraphs 55, 56 and 58, asking if they were going out of business . . . .

74. Upon information and belief, Defendants informed the Tyler Fire Companies' customers, potential customers, vendors and employees that High Peaks had replaced or was in the process of replacing the Tyler Fire Companies as the exclusive dealership for Pierce products and services, creating a panic amongst those customers, potential customers, vendors

and employees of the Tyler Fire Companies, including, but limited to, employees Timothy Burgess, Thomas Costigan, Christopher Schongar, Paul Sedal, and individuals identified in paragraphs 55, 56, 58, 68, 69 and 70. This caused significant harm to the Tyler Fire Companies . . . .

84. On or about April 25, 2014, Olszanski ended his employment with the Tyler Fire Companies. He and Mastrobattista had established High Peaks as a direct competitor to the Tyler Fire Companies, located approximately 15 miles (and 15 minutes) away from the Tyler Fire Companies . . . .

88. Prior his employment with the Tyler Fire Companies, Olszanski had worked at Arrowhead. Upon information and belief, Olszanski provided to Pierce detailed information concerning the possible acquisition of the Tyler Fire Companies by Arrowhead. This reflected a plan, already devised by Pierce and individuals who would later form High Peaks, to drive the Tyler Fire Companies out of business and to establish High Peaks formed entity as the Pierce dealer in place of the Tyler Fire Companies . . . .

1st Am. Compl. Plaintiffs allege eight causes of action. **Count I** alleges a violation of the

Automobile Dealers' Day in Court Act (by Tyler Fire Equipment against Pierce):

105. Pierce failed to act in good faith in complying with the terms of the Dealership Agreement and the Pierce Confidentiality Agreement, when Pierce, by and through its officers, employees, and/or agents violated its duty to act in a fair and equitable manner toward Tyler Fire Equipment and to guarantee to Tyler Fire Equipment freedom from coercion, intimidation or threats of coercion or intimidation by Pierce, a violation of the ADDCA.

106. Pierce, by and through its officers, employees and/or agents, made statements in disparagement of Tyler Fire Equipment, its stock of parts, and its value as a going business, to Tyler Fire Equipment's customers, potential customers, vendors and employees, including, but not limited to, those identified in paragraphs 55, 56, 58, 68, 69, 70 and 74, a violation of the ADDCA. 107. Pierce, by and through its officers, employees and/or agents, intentionally interfered with and influenced the relationships between Tyler Fire Equipment and its customers, potential customers, vendors and employees, a violation of the ADDCA. 108. Pierce, by and through its officers, employees and/or agents, intentionally interfered with contracts between the Tyler Fire Equipment and its customers, vendors and employees, by, among other things, unlawfully disclosing Confidential Information regarding Tyler Fire Equipment to Tyler Fire Equipment's customers, potential customers, vendors and employees, a violation of the ADDCA.

109. Pierce, by and through its officers, employees and/or agents, used nonrenewal notices in a bad faith attempt to maximize its profits at Tyler Fire Equipment's expense and to cause the demise of Tyler Fire Equipment, a violation of the ADDCA.

**Count II** alleges a breach of contract (by Plaintiffs against Mastrobattista, Olszanski, and High Peaks):

115. Mastrobattista, Olszanski and High Peaks expressly and by their conduct breached the High Peaks Confidentiality Agreement by unlawfully disclosing Confidential Information to reduce the potential purchase price of the Tyler Fire Companies, knowing that Mastrobattista, Olszanski and High Peaks would soon be direct competitors of the Tyler Fire Companies, and to harm the Tyler Fire Companies with respect to their customers, potential customers, vendors and employees, in an ultimate effort to bring about the demise of the Tyler Fire Companies and to wrongfully appropriate their customers and potential customers and other business relationships.

**Count III** alleges fraudulent inducement (by Plaintiffs against Mastrobattista, Olszanski, and High Peaks):

120. Mastrobattista, Olszanski and High Peaks made misrepresentations of material fact to the Tyler Fire Companies that Mastrobattista, Olszanski and High Peaks sought to conduct good faith negotiations to purchase the Tyler Fire Companies.

121. However, upon information and belief, Mastrobattista, Olszanski and High Peaks made those misrepresentations to obtain, use and disclose information in order to harm the Tyler Fire Companies' relationships with customers, potential customers, employees and vendors, to reduce the potential purchase price of the Tyler Fire Companies, and, once they realized that they would not be able to obtain the necessary financing to purchase the Tyler Fire Companies, to harm the Tyler Fire Companies knowing that High Peaks would soon be a direct competitor of the Tyler Fire Companies.

123. Mastrobattista, Olszanski and High Peaks, through their misrepresentations, fraudulently induced the Tyler Fire Companies to enter into the High Peaks Confidentiality Agreement and to disclose protected and valuable information to Mastrobattista, Olszanski and High Peaks.

**Count IV** alleges unjust enrichment (by Plaintiffs against Mastrobattista, Olszanski, and High Peaks):

126. As a result of their fraudulent and wrongful acts, Mastrobattista, Olszanski and High Peaks have been enriched at the expense of the Tyler Fire Companies and have unlawfully accepted and received the benefits of decades of hard work by the Tyler Fire Companies in promoting products and services, establishing customer and vendor accounts and relationships, and training and developing employees and staff, among other things.

**Count V** alleges a breach of contract (by Plaintiffs against Pierce and McAlice):

130. Pierce and McAlice expressly and by their conduct breached the Pierce Confidentiality Agreement by disclosing Confidential Information to reduce the potential purchase price of the Tyler Fire Companies and to harm the Tyler Fire Companies with respect to their customers, potential customers, vendors and employees.

133. The Pierce Confidentiality Agreement provides that the Tyler Fire Companies may seek injunctive relief regarding any breach of the Pierce Confidentiality Agreement. The Tyler Fire Companies will suffer irreparable harm if Pierce and McAlice are not enjoined from violating the Pierce Confidentiality Agreement.

**Count VI** alleges another breach of contract (by Tyler Fire Equipment against

Pierce):

136. Pierce expressly and by its conduct breached the Dealership Agreement by failing to provide to Tyler Fire Equipment proposed annual performance standards for review and acceptance by Tyler Fire Equipment, a violation of Paragraph 3.3 of the Dealership Agreement. Pierce merely provided to Tyler Fire Equipment annual sales targets, without seeking or obtaining the approval of those sales targets from Tyler Fire Equipment.

137. Pierce expressly and by its conduct breached the Dealership Agreement by unreasonably withholding its consent to the transfer by Tyler Fire Equipment of its interest or right in the Dealership Agreement, or of the principal business assets of Tyler Fire Equipment, or of direct or indirect ownership or operating management of Tyler Fire Equipment.

**Count VII** alleges tortious interference with existing contractual relations (by

Plaintiffs against all Defendants):

141. Valid and binding contracts existed between the Tyler Fire Companies and their customers, including, but not limited to, fire stations located in Ausable Forks, Lake Placid, Latham, Plattsburg (Stations 2 and 3), Round Lake, Salem and West Albany, New York, and in Clifford, Pennsyl-

vania, and with vendors, including, but not limited to, Scott Safety.

142. Upon information and belief, Defendants had knowledge of those contracts through information obtained by Olszanski and through disclosures made pursuant to the High Peaks Confidentiality Agreement and the Pierce Confidentiality Agreement; and, with respect to Pierce and McAlice, through their long-term business relationship with the Tyler Fire Companies and the information they possessed pursuant to contract and as the supplier of goods and services to the Tyler Fire Companies.

143. As a result of the impermissible disclosure of information by Defendants, many of the Tyler Fire Companies' customers became alarmed and ceased purchasing products from the Tyler Fire Companies or otherwise ceased doing business with the Tyler Fire Companies, in violation of their respective contracts with the Tyler Fire Companies. A vendor, Scott Safety, has also breached its agreement with the Tyler Fire Companies as a direct result of Defendants' intentional and wrongful acts.

144. Defendants intentionally procured those breaches, without justification, in an attempt to establish High Peaks as a Pierce dealership in place of the Tyler Fire Companies, and to destroy the Tyler Fire Companies, all at the expense of the Tyler Fire Companies and to the benefit of Defendants.

Finally, **Count VIII** alleges tortious interference with prospective business relations (by Plaintiffs against all Defendants):

147. The Tyler Fire Companies had prospective business relationships with customers, including, but not limited to, fire departments located in Endwell, Scriba and Scotia, New York.

148. Defendants interfered with those relationships by, among other things, disclosing Confidential Information regarding the potential sale of the Tyler Fire Companies and spreading lies and rumors regarding the ownership of the Tyler Fire Companies and the continued viability of the Tyler Fire Companies, both generally, and, specifically, as a Pierce dealer.

149. But for Defendants' wrongful conduct, the Tyler Fire Companies would have done business with those potential customers, among others, particularly in light of the Tyler Fire Companies' reputation as a trustworthy and competent dealership and servicer, their establishment of long-term and mutually beneficial relationships with customers, and the genuine interest expressed by potential customers in receiving goods and services from the Tyler Fire Companies, as was evidenced, in part, by those potential customers only withdrawing from discussions with the Tyler Fire Companies upon being contacted directly by Defendants and/or having heard

rumors of the demise of the Tyler Fire Companies.

150. Defendants' intentional interference with these prospective business relations through rumors and lies specifically designed to harm the Tyler Fire Companies, resulted in those entities being compelled by Defendants to work and contract directly with Defendants, thus bypassing the Tyler Fire Companies entirely.

151. Defendants interfered with these prospective business relations by dishonest, unfair and improper means in an attempt to establish High Peaks as a Pierce dealership in place of the Tyler Fire Companies, and to destroy the Tyler Fire Companies, all at the expense of the Tyler Fire Companies and to the benefit of Defendants.

Plaintiffs seek the following relief:

(i) Enjoin Pierce from ceasing to supply goods and services to Plaintiffs;

(ii) Enjoin Pierce from terminating Plaintiffs' exclusive dealership rights in the Territory;

(iii) Enjoin Mastrobattista, Olszanski and High Peaks from competing with Plaintiffs in the Territory;

(iv) Enjoin Defendants from disclosing Confidential Information in violation of the Pierce Confidentiality Agreement, High Peaks Confidentiality Agreement and LOI;  and

(v) Award to Plaintiffs the following:

      a. actual and compensatory damages in an amount to be determined at trial;

      b. lost profits in an amount to be determined at trial;

      c. liquidated damages in an amount to be determined at trial;

      d. reasonable attorneys' fees and costs;

      e. pre-judgment and post-judgment interest; and

      f. such other and further relief as this Court deems just and proper.

### *High Peaks', Mastrobattista's, and Olszanski's Motion to Dismiss Counts III, IV, VII, and VIII*

High Peaks moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Counts III, IV, VII, and VIII of the First Amended Complaint. High Peaks, which had

moved to dismiss certain claims in the original complaint, argues in its memorandum of law in support of the pending motion that the First Amended Complaint "impermissibly seeks to add tort claims to the breach of contract claim against the High Peaks Defendants, which tort claims merely restate the contract claim or are otherwise deficient." High Peaks Mem. of Law 3, Jan. 22, 2015, ECF No. 33-2.

### Pierce's and McAlice's Motion to Dismiss Count VII

The Pierce defendants contend that Plaintiffs have failed to allege enough facts to support the claim that both defendants interfered with prospective business relations. They argue that the First Amended Complaint alleges that The Pierce defendants "acted, at least in part, to 'maximize their profits' or otherwise 'benefit' themselves. Am. Compla. ¶¶ 50, 57, 73, 151. Where economic self-interest is a motivating factor, a plaintiff cannot, as a matter of law, satisfy the 'sole purpose' element of the tort." Pierce Mem. of Law 10, Jan 23, 2015, ECF No. 36.

## STANDARD OF LAW

The U.S. Supreme Court, in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), clarified the standard to be applied to a 12(b)(6) motion:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 1964-65 (citations and internal quotations omitted).  *See also*, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations

sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp. v. Twombly*) (footnote omitted); *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) (Indicating that *Bell Atl. Corp. v. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.)

When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (1999), *cert. denied*, 531 U.S. 1052 (2000). On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995)(*citing In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 400–01 n. 3 (2d Cir.1994)).

## ANALYSIS

### Count III

The High Peaks defendants seek dismissal of Count III, which alleges that they made misrepresentations of material fact to Plaintiffs. Plaintiffs contend that the High Peaks defendants said that they sought to conduct good faith negotiations to purchase the companies, but instead, fraudulently induced Plaintiffs into entering into a confidentiality agreement and into disclosing valuable information to the High Peaks defendants. 1st Am. Compl. ¶¶ 119–24. The High Peaks defendants argue that the allegations in paragraph 88 that they breached the confidentiality agreement mirror the allegations in paragraph 115 and that, in actuality, Count III is merely restatement of Count II, Plaintiffs' contract claim, in tort language. The Court agrees.

First, Plaintiffs' complaint does not meet the standards required of a fraud plead-ing set by Federal Rule of Civil Procedure 9. Second, "[g]eneral allegations that defend-ant entered into a contract while lacking the intent to perform it are insufficient to sup-port the claim." *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995) (citations omitted).

### *Count IV*

The High Peaks defendants seek dismissal of Count IV, which alleges that:

> As a result of their fraudulent and wrongful acts, Mastrobattista, Olszanski and High Peaks have been enriched at the expense of the Tyler Fire Companies and have unlawfully accepted and received the benefits of decades of hard work by the Tyler Fire Companies in promoting products and services, establishing customer and vendor accounts and relation-ships, and training and developing employees and staff, among other things.

1st Am. Compl. ¶ 126. As with the claim in Count III, this claim is also simply a restate-ment of the breach of contract claim in Count II. As the New York Court of Appeals ob-served, "A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment. *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388 (1987). Plaintiffs' unjust enrichment claim is, in essence, a quasi contract claim, and such a claim is precluded where, as here, the relationship between the parties and the basis for the claim arises from a written contract. Therefore, Count IV is dismissed.

### *Counts VII & VIII*

In order to plead a claim for either tortious interference with contract, or tortious interference with prospective economic advantage, requires the following under New York law:

> A properly pled complaint for tortious interference with contract under New York law must allege: "(1) the existence of a valid contract between the

plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir.2006) (internal quotation marks and citation omitted). A properly pled complaint for tortious interference with prospective economic advantage requires something similar: "(1) [plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Id.* at 400.

*B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 484 (S.D.N.Y. 2010). Plaintiffs allege:

Defendants intentionally procured those breaches, without justification, in an attempt to establish High Peaks as a Pierce dealership in place of the Tyler Fire Companies, and to destroy the Tyler Fire Companies, all at the expense of the Tyler Fire Companies and to the benefit of Defendants.

1st Am Compl. ¶ 143. In *B & M Linen, Corp.*, the district court ruled that the plaintiff had "not even tried to allege that the defendants intended to disrupt its business relationships with hoteliers—much less offered any factual support for such a contention." *Id.* at 484. Consequently, the court dismissed that cause of action. Here, in contrast, Plaintiffs have specifically alleged that Defendants attempted to "destroy" their companies.

The Pierce defendants also argue that the first amended complaint fails to identify the specific contracts, and specific provisions within those contracts, with which they allegedly interfered. Pierce Reply Mem. 1, Feb. 27, 2015, ECF No. 43. On this, the Pierce defendants rely on *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398 (S.D.N.Y. 2012), in which the district court stated the following:

First, Plaintiff has not plausibly alleged adequate details about a specific contract between itself and a third party, but merely has alleged that it has "agreements" with its customers. This is insufficient. *See Bose v. Interclick, Inc.,* No. 10–CV–9183, 2011 WL 4343517, at *10–11 (S.D.N.Y. Aug. 17, 2011) (dismissing tortious interference with contract claim where plaintiff claimed generally that it had contracts with various parties, but did not

give "facts regarding the terms of the contracts or the specific parties to the contracts"); *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.,* 665 F.Supp.2d 239, 255 (S.D.N.Y.2009) (denying leave to amend tortious interference with contract claim that had been dismissed, because plaintiffs alleged only that "defendants interfered with their customer contracts," but did not "specify a single customer contract with which defendants interfered"); *Berman v. Sugo LLC,* 580 F.Supp.2d 191, 208 (S.D.N.Y.2008) (dismissing claim that simply alleged that a contractual relationship with a third party existed, but set forth no facts to allege the type of contract, whether it was nonexclusive, and whether it was valid).

*Id.* at 403. The *Bose* court, cited above, explains the pleading requirement this way:

Plaintiff does not specify any individual contract that was breached, but just claims generally that Plaintiff had contracts with various website operators which were all breached. (Am. Compl. ¶ 194.) Plaintiff's allegations are far too general to state a claim for tortious interference with contract, because without facts regarding the terms of the contracts or the specific parties to the contracts, it cannot be determined if a contract indeed existed or if Defendants' activities procured a breach of those contracts.

*Bose*, 2011 WL 4343517 at *10. Plaintiffs' allegations of contractual interference consist of Plaintiffs' being "forced to cancel contracts with their customers," 1st Am. Compl. ¶ 26, Plaintiffs' suffering "a notable decline" in new sales among fire departments that previously entered into contract negotiations with Plaintiffs, *id.* ¶ 57, forwarding of a confidential service contract (otherwise unidentified) to Olszanski by Alquotob, *id.* ¶ 89, and general allegations that Pierce interfered with "contracts" between Plaintiffs "and its customers, vendors and employees," listing seven locations of fire stations and one vendor with which Plaintiffs' allege they had binding contracts, *id.* ¶¶ 108, 141. The case law is clear; more is required. Although the first amended complaint does allege the existence of "binding contracts" with the named fire companies and vendor, it does not identify or describe the provisions of the contracts with which Defendants allegedly tortiously interfered. For example, did the contracts bind the fire companies to purchase exclusively from Plaintiffs? *See Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 499 (S.D.N.Y.

2002) *aff'd*, 65 F. App'x 736 (2d Cir. 2003) ("But the Amended Complaint fails to identify the exact terms breached as a result of Rare Medium's acts.").

The Pierce defendants also point out that Plaintiffs' complaint assumes Defendants had knowledge of the contracts allegedly breached because of their actions. In the first amended complaint, Plaintiffs allege that "Defendants had knowledge of those contracts through information obtained by Olszanski and through disclosures made pursuant to the High Peaks Confidentiality Agreement and the Pierce Confidentiality Agreement; and, with respect to Pierce and McAlice, through their long-term business relationship with the Tyler Fire Companies and the information they possessed pursuant to contract and as the supplier of goods and services to the Tyler Fire Companies." 1st Am. Compl. ¶ 142. However, the Pierce Confidentiality Agreement, attached to the first amended complaint as Exhibit B, states only that Plaintiffs would "furnish to the Undersigned certain confidential information," and does not list the contracts as among that furnished information.

The Court concludes that Plaintiffs' Count VII fails for the above-discussed reasons. Turning now to Count VIII, the Court likewise finds that Plaintiffs' complaint does not plead a plausible cause of action for tortious interference with business relations. Plaintiffs are proceeding on the theory that Defendants used wrongful means to harm Plaintiffs' relations with its customers and vendors. In *Carvel Corporation v. Noonan*, 3 N.Y.3d 182 (2004), the Court of Appeals issued an opinion on a case certified to it by the Second Circuit. The question posed by the Second Circuit was: "Under applicable standards for a claim of tortious interference with prospective economic relations, did the evidence of the franchisor's conduct in each of the three trials on review in these

consolidated appeals permit a jury finding in favor of the franchisee?" *Id.* at 188-89. The

Court of Appeals answered, "No." Specifically, the New York court determined that:

> [W]here a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not "lawful" but "more culpable." The implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be "lawful" and thus insufficiently "culpable" to create liability for interference with prospective contracts or other nonbinding economic relations.

*Carvel Corpl.*, 3 N.Y.3d at 190. The allegations in the first amended complaint at issue

here are that Defendants spread rumors that Plaintiffs were going out of business and

that Pierce was going to choose another company to sell its products, and disclosed

confidential information in breach of the confidentiality agreements. The Court sides

with the majority of other courts that have found this alleged behavior does not meet the

requirement of a "crime or an independent tort" set by the New York Court of appeals.

"[I]n the years since *Carvel II* was decided, courts have been stingy in their interpreta-

tion of this tort, and have resisted invitations to go beyond the language of the Court of

Appeals." *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329,

346–47 (S.D.N.Y. 2008) (collecting cases). Therefore, Count VIII is also dismissed.

### Leave to File a Second Amended Complaint

In its memorandum of law opposing the motions to dismiss, Plaintiffs seek leave

to file a second amended complaint. Pl.s' Mem. of Law 11, Feb. 13, 2015, ECF No. 40.

The Pierce defendants oppose Plaintiffs' request, arguing that "[b]ecause Plaintiffs have

already amended their Complaint once and failed to cure these critical deficiencies,

dismissal with prejudice is appropriate." Pierce Reply Mem. of Law 7, Feb. 27, 2015,

ECF No. 43. The High Peaks defendants seek dismissal of Counts III, IV, VII, and VIII,

with prejudice. High Peaks Reply Mem. of Law 10, Feb. 26, 2015, ECF No. 42.

Courts must freely give leave to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). Nevertheless, "a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes v. Grubman,* 568 F.3d 329, 334 (2d Cir.2009) (citation and internal quotation marks omitted). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Martin v. Dickson,* No. 03–7917, 100 Fed. Appx. 14, 16, 2004 WL 1205185 at *2 (2d Cir. Jun. 2, 2004) (unpublished, citation omitted).

Plaintiffs already had the benefit of the Pierce defendants' first motion to dismiss, which addressed the same deficiencies in the pleaded causes of action as were addressed in the present motions. *See* Pierce Mem. of Law 7, Nov. 17, 2014, ECF No. 20 (arguing that Plaintiffs cannot convert their contract claims into tort claims). Absent a change in the law, it does not appear that Plaintiffs can overcome the futility of amending Counts III and IV. As to counts VII and VIII, the Court has identified pleading deficiencies which might be overcome by sufficiently plead facts. Therefore, as to those two counts, Plaintiffs have the Court's leave to amend. However, the Court reminds counsel of the obligation to ensure "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances…" that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery…." Fed. R. Civ. P. 11(b)(3).

**CONCLUSION**

Counts III and IV are dismissed with prejudice pursuant to Rule 12(b)(6); Counts VII and VIII are dismissed without prejudice pursuant to Rule 12(b)(6), and Plaintiffs have leave to file a motion to amend those two Counts pursuant to Rule 15(a)(2) as long as such a motion is filed on or before July 16, 2015.

DATED:   June 16, 2015
          Rochester, New York

                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge